ARCHIBALD S. LAMBERT

*v.*

IDA M. VARE.

[Submitted July 7th, 1917.   Determined July 18th, 1917.]

1. The owner of land between a street running parallel with the sea coast laid the tract out in streets, blocks, and lots, the streets running from the existing street to the shore.  Her conveyance of part thereof described the tract sold as beginning at the line of the original street, running thence southerly 275 feet;  thence easterly, parallel with the original street, 165 feet to the east line of another street;  thence northerly in the line of such street 275 feet to the original street;  thence to place of beginning.  The map referred to showed fractional lots not numbered lying between the tract so described and the ocean.—*Held*, that the tract conveyed did not extend to the ocean.

2. The owner of land lying between the ocean and a street when she conveyed a tract running from the parallel street 275 feet toward the water and bounded on two sides by mapped streets laid out by her, covenanted that all lands which should thereafter be made by accretions from the ocean or should accrue to her by reason of a boardwalk being moved oceanward, &c., should be subdivided into lots of the size of those shown on the map, that the streets shown on the map should be continued to the high-water line of the ocean, and that all of the restrictive building covenants should be binding on such additional lots.—*Held*, that the covenant was not limited to accretions to that part of the owner's tract which did not lie to seaward of the land so sold;  the description thereof not purporting to extend to the ocean.

3. In suits to quiet title, complainant, who must be adjudged to be in peaceable possession before jurisdiction over the issue of title can be assumed, is given the benefit of his peaceable possession, and defendant assumes the burden of the affirmative on the issue of title, and carries the burden of establishing a title in conformity with the specification of title which the statute requires him to set forth in his answer.

4. When a deed calls for the ocean as a boundary, the land conveyed extends to the ocean for all time, whether high-water mark recedes or encroaches by natural accretions or erosions.

5. In a suit to quiet title to a tract of land forming part of a beach, evidence held not to justify finding that the line of ordinary high tide of the ocean when title passed from the common source of title to defendant's predecessor was shoreward of a line two hundred and seventy-five feet southerly of a street running parallel with the shore, or coincident with such line.

On final hearing on bill to quiet title.

*Mr. Clarence L. Cole,* for the complainant.

*Mr. Lewis Starr* and *Mr. Charles C. Babcock,* for the defendant.

LEAMING, V. C.

This suit has been brought by complainant to quiet title to a tract of land which forms a part of the beach front at Atlantic City. At the hearing complainant's peaceable possession was established; no issue at law having been demanded this court then proceeded to final hearing on the issue of title.

All, or nearly all, of the *locus in quo* appears to have been below or oceanward of the line of ordinary high tide of the ocean at some time prior to this date. Both complainant and defendant have acquired from the state riparian leases covering the disputed territory; but both riparian leases contain the usual provision that the lease shall be void and of no effect if the person to whom the lease is made is not the owner in fee of the fast land adjoining the land in which the right of the state is conveyed. The riparian lease to defendant contains a further clause that it is made subject to any rights which were acquired by Jesse R. Turner under a former riparian lease made to Turner by the state covering the same territory. Complainant now enjoys any rights acquired by Turner under that riparian lease.

Part of the controverted territory, though covered by the descriptions contained in these two riparian leases, has now become "fast land" by reason of accretions from the ocean; the title to that part of the *locus in quo* accordingly requires no riparian grant for its support, unless such accretions are to be deemed

artificial; the outer or oceanward part of the *locus in quo* is still probably below the line of ordinary high-water mark, and title to that portion apparently can only be claimed under the state.

It is conceded that August 3d, 1901, Hannah E. Kelley was the owner of a large tract of land extending from Atlantic avenue to the ocean, and as such owner was then owner of the *ripa*. No title or rights had at that time ever existed in any of the territory oceanward of the Kelley tract except the rights of the state therein. Atlantic avenue runs parallel to the ocean and the Kelley tract embraced the territory lying between the ocean and Atlantic avenue from Columbia avenue on the east to Tallahassee avenue on the west.

The primary dispute at the foundation of the present controversy arises from a deed of conveyance made by Mrs. Kelley to John M. Hilton for a large portion of the Kelley tract. That deed described the land conveyed as commencing at Atlantic avenue and extending toward the ocean to a line parallel to Atlantic avenue and two hundred and seventy-five feet distant therefrom. As will hereinafter be more fully pointed out, that deed was obviously made upon the assumption on the part of the parties thereto that the tract conveyed did not extend to the ocean, but left land owned by Mrs. Kelley between the ocean and the extreme southerly boundary of the tract thus conveyed. Upon that assumption Mrs. Kelley subsequently (in 1903) conveyed to Jesse R. Turner and Harry R. Young the land lying between the southerly boundary line described in the Hilton deed and the ocean, that deed, calling for the ocean as the southerly boundary of the tract conveyed. It is under the rights conferred by that deed that complainant now holds.

Defendant claims that although the deed from Mrs. Kelley to Hilton did not purport to extend to the ocean, it in fact did so extend, because, as it is now alleged by defendant, the ordinary high-water mark of the ocean was at that time within two hundred and seventy-five feet of Atlantic avenue, and Hilton accordingly became riparian owner by operation of that grant. Under that assumption defendant has acquired the benefits of a quitclaim deed from Hilton extending from a point two hundred and thirty-six feet south from Atlantic avenue to the ocean.

It thus will be observed that complainant claims the ownership of the *ripa* under the deed from Mrs. Kelley to Young and Turner, which claim assumes that her earlier deed to Hilton did not constitute Hilton riparian owner, and defendant claims the *ripa* under a deed from Hilton, which claim assumes that the deed from Mrs. Kelley to Hilton did convey the *ripa*.

Accordingly, the major portion of the testimony has been directed to the ascertainment of the line of ordinary high tide of the ocean at the date of the deed from Mrs. Kelley to Hilton with a view of ascertaining whether that deed constituted Hilton the riparian owner. If it did, the subsequent deed from Mrs. Kelley to Turner and Young for the territory extending from the southerly boundary named in the Hilton deed to the ocean, under which deed complainant claims to have acquired the *ripa*, would obviously convey nothing.

A proper examination of this issue necessitates a more detailed statement of the Kelley-Hilton conveyance, its terms, and the map with reference to which it was made.

As already stated, it is conceded that Hannah E. Kelley, prior to August 3d, 1901, owned the tract of land extending northerly and southerly from Atlantic avenue to the ocean and extending easterly and westerly from Columbia avenue to Tallahassee avenue. The legal title to a portion of the tract was in one Henderson Synnamon, but that circumstance is conceded to be immaterial.

Prior to August 3d, 1901, Mrs. Kelley had caused the tract to be laid out in streets, blocks and lots, and had filed in Atlantic county clerk's office a map of the tract which delineated those physical features. That map discloses streets extending north and south from Atlantic avenue to the ocean and numbered lots between the streets. These several streets, in order, beginning with the most easterly street, are Columbia avenue, Bartram Place, Millidgeville avenue (now called Kingston avenue), Berkley Square and Tallahassee avenue. As the land now in controversy lies oceanward of the tier of lots easterly of and adjacent to Berkley Square, only that portion of the map between Millidgeville avenue and Berkley Square need be specifically shown. The following is a copy of that portion of the map:

[Copy of map omitted.]

August 3d, 1901, an agreement was executed by Mrs. Kelley and John M. Hilton, by the terms of which Mrs. Kelley agreed to sell to Hilton on terms specifically named certain specified portions of her tract. That part of the tract lying between Millidgeville avenue and Berkley Square is described in that agreement as follows:

"Also beginning at the southwest corner of Atlantic and Millidgeville avenues and runs thence (1) southwardly in the west line of Millidgeville avenue two hundred and seventy-five feet; thence (2) eastwardly parallel with Atlantic avenue one hundred and sixty-five feet to the east line of a fifty-feet-wide street called Berkley Square; thence (3) northwardly in the east line of said Berkley Square, parallel with Millidgeville avenue two hundred and seventy-five feet to the southerly line of Atlantic avenue; thence (4) eastwardly in the southerly line of Atlantic avenue one hundred and sixty-five feet to the place of beginning. Being lots numbered  *  *  *  1 to 14, inclusive, in block 26 of lands belonging to Hannah E. Kelley situate between Atlantic avenue and the Atlantic ocean from Columbia avenue to Tallahassee avenue, in Atlantic City aforesaid, and duly laid out in blocks and lots by the said Hannah E. Kelley, a map or plan of which is filed in the clerk's office of the county of Atlantic, at May's Landing, New Jersey, and a copy of which is attached hereto and made a part hereof."

It will be observed that this description of the land between Millidgeville avenue and Berkley Square embraces fourteen specific lots, and is a rectangular tract, the southerly boundary of which is described as parallel to Atlantic avenue and two hundred and seventy-five feet distant therefrom; and further that the map, a copy of which is attached to the agreement, discloses fractional lots, not numbered, lying between the two hundred and seventy-five feet boundary line and the ocean, as delineated on the map. It should also be here added that the agreement of sale embraced all the lots lying between Bartram Place and Millidgeville avenue, and also those lying between Columbia avenue and Bartram Place, designated as lots 1 to 21, inclusive, in block 24, and that the description of these lots was in like manner to a line two hundred and seventy-five feet south of and parallel with Atlantic avenue; and also that the map discloses fractional lots between the ocean and the said lots numbered from 1 to 21.

From the manner in which the land to be conveyed is described in this agreement by reference to the map attached to it,

it is entirely obvious that the parties to the agreement did not undertake to extend the land on which the agreement operated to the ocean, but, on the contrary, attempted to stipulate for the sale of a tract of land to a definite straight line distant two hundred and seventy-five feet southerly from and parallel with Atlantic avenue without including land which the map disclosed as lying between the ocean and the two hundred and seventy-five feet line. It is this boundary line, two hundred and seventy-five feet southerly from Atlantic avenue, which defendant now claims was, at the date of this agreement, in fact in the ocean, and hence, it is claimed, the conveyance made pursuant to the agreement in fact included the *ripa,* even though the parties to the agreement may have intended and believed to the contrary.

The conclusion that the parties to this agreement, and the conveyance which followed it, did not intend to convey to the ocean, is not only apparent from the manner in which the land is described and the delineations of the map annexed to the agreement, but is also reasonably apparent from certain covenants contained in the agreement, and in the conveyance subsequently made pursuant to the agreement, which covenants related to the unsold portion of the Kelley tract. The agreement contains a series of restrictive building covenants subject to the operation of which the contemplated conveyance was to be made, and also provides that the same restrictive covenants should be inserted in all deeds of land thereafter made by Mrs. Kelley of the remaining portion of her tract, and then provides as follows:

"That all lands which shall hereafter be made by accretions from the Atlantic ocean, or which shall accrue to her to the northward of the present boardwalk by reason of the same being moved oceanward or by reason of the lines of the present Ocean Front Park being moved oceanward, shall be subdivided into lots of the same size as those shown on the map aforesaid; that the streets shown on the map aforesaid shall be continued to the high-water line of the Atlantic ocean; and that all of the following covenants and restrictions shall be binding and enforceable upon such additional lots which shall accrue to her by reason thereof."

It is claimed by defendant that this covenant has reference only to accretions to that part of the Kelley tract which is not southerly of the land described in the agreement; but it seems impossible to attribute to it that restricted application. When

it is considered that the description of the land to be sold does not purport to extend to the ocean, and that the general description of her entire tract refers to the ocean as its southerly boundary, and that the description is made with reference to a map which shows land between the land to be sold and the ocean, and that the primary interest of the purchaser would necessarily be in the preservation of the restrictive covenants in land to be sold in front or oceanward of the tract purchased, it seems impossible to conclude that the stipulation above quoted was not intended to bind Mrs. Kelley to observe those restrictive covenants as to land thereafter acquired by her through accretions in front of the tract to be conveyed pursuant to the agreement.

The deed from Mrs. Kelley to Hilton, pursuant to the agreement already considered, was made December 31st, 1901. That deed contains a description of the land in the same language as the agreement and contains the same covenants as the agreement. Whether that part of the covenants contained in the agreement and deed of conveyance which confirmed all subsequent accretions to Mrs. Kelley was operative to vest in her an equitable title to the accretions thereafter forming, as against a person claiming the accretions under Hilton, if the two hundred and seventy-five feet boundary line should now be found to have then been in fact oceanward of high-water mark, I think it unnecessary here to consider.

In suits to quiet title the complainant, who must be adjudged to be in peaceable possession before jurisdiction over the issue of title can be assumed, is given the benefit of his peaceable possession and defendant then assumes the burden of the affirmative of the issue of title and carries the burden of establishing a title in conformity with the specification of title which the statute requires such defendant to set forth in his answer. Accordingly, at the hearing defendant assumed the burden of establishing that the line of ordinary high tide of the Atlantic ocean was shoreward of two hundred and seventy-five feet from Atlantic avenue at the point shown as lot 14 on the Kelley map when the title passed from Mrs. Kelley to Hilton.

The difficulty in establishing a fact of that nature more than sixteen years after the date under investigation is apparent from

the nature of the testimony adduced at the hearing. Conflicting testimony, due to the frailty of memory of witnesses after so long an interval of time, is inevitable in almost any case; but the ascertainment of the location of the line of ordinary high tide of the Atlantic·ocean on a nearly level sand beach upon which the uninterrupted waves of the ocean wash, introduces many elements of uncertainty not incident to ordinary issues. When a deed calls for the ocean as a boundary, the boundary is certain for all time, for it extends to the ocean whether high-water mark of the ocean recedes or encroaches by natural accretions or erosions. But the accurate ascertainment of the location of the line of ordinary high tide on our South Jersey ocean front at a given date sixteen or seventeen years prior to the period of investigation approaches the impossible. An inch of elevation may represent many feet of distance in the shoreward point to which the waves of the ocean extend, and each successive wave varies in force and height; and to this must be added the circumstance that the influence of the moon and sun causes every tide—even the two tides of each day—to vary in height, and there must also be recognized the additional circumstance that winds and storms, whether present or recent, and whether near or far removed, also render the tides abnormal, and even barometic pressure materially affects their height. These and divers other circumstances disclose the imperative necessity for accurate data, if certainty is to be attained, where the issue involved is whether ordinary high tide of the ocean was a few feet shoreward or oceanward of a given point at a given time. On a fresh-water river the line of vegetation may form a reasonably accurate guide, and on inland salt waters, especially where steep banks exist, the water stains on the coarse salt grasses afford an aid; but on an almost level ocean-washed sand beach, where no vegetation exists either below or above the line of high tide, the difficulties presented in the absence of scientific data are almost unsurmountable. The mark impressed upon the sands by the preceding high tide signifies little unless the conditions surrounding that high-water mark are taken into account, and the debris deposited on the beach, if any, by preceding high waters, signifies little unless it is known whether such deposit has been the result of a storm tide.

In my judgment, the evidence in this suit does not justify a finding that the line of ordinary high tide of the ocean was shoreward of the line two hundred and seventy-five feet southerly of Atlantic avenue or even reached that line at the time title passed from Mrs. Kelley to Hilton.

A detailed review of the testimony seems unnecessary. Some witnesses have testified that at what they called ordinary high tide the water did extend shoreward of at least some parts of the line in question; others have testified to the reverse. The witness for defendant whose testimony most impressed me was John Leeds. His work on the premises was of a nature to appropriately impress upon his memory the tidal conditions there existing at the time his work was performed, and his statement is that the line of ordinary high tide was fifteen or twenty feet inside the two hundred and seventy-five feet boundary line. Others in like position to observe have testified to substantially the same. On the contrary, witnesses for complainant whose testimony seems entitled to equal weight have testified that the line of ordinary high tide was outside or oceanward of the two hundred and seventy-five feet line. These witnesses include members of the life guard who patroled the beach daily, or twice daily, for a period of time from long before to after the time of inquiry.

Most of the testimony has been directed to conditions existing in March, 1902, and subsequent thereto. This arises from the fact that in March, 1902, the erection of a bulkhead was begun on the two hundred and seventy-five feet boundary line. This was some two or three months after the deed from Mrs. Kelley to Hilton was made, and over six months after the agreement of sale which conferred the equitable title on Hilton. That bulkhead was begun at a point easterly of the locality now in question and was being constructed in a westerly direction on the line here in controversy. The testimony of several of the witnesses of defendant who worked on that structure is to the effect that when that bulkhead had been built about one-half of its proposed length—probably to about Millidgeville avenue—a severe storm occurred which washed away the engine which was used in connection with the work and thus interrupted the work for a time.

Mr. Bowen, who was inspector on that work, testified that that storm washed away the beach about two feet in depth at the vicinity of Berkley Square, and that prior to that storm the tides had not interfered with their work, but that after the storm the tide came fifteen or twenty feet inside the line of their proposed work at Berkley Square. The testimony of other witnesses of defendant who were employed on that work is consistent with the view that prior to that storm the tides did not reach the line of their work, but after the storm it did extend beyond that line in the vicinity of Berkley Square, owing to the washout caused by that storm. The single fact that the stationary engine which supplied power for the work on the bulkhead was located fifteen or twenty feet outside or oceanward of the line of the bulkhead up to the time of the storm strongly indicates that ordinary tides did not reach the line in question. The circumstance that in March or April, 1902, a storm washed away that part of the beach in such manner as to cause ordinary tides to extend landward of the two hundred and seventy-five feet line in question is obviously immaterial if, in the year 1901, when the Hilton title was acquired by him, the exterior line of his grant extended only to a point shoreward of high-water mark. *Ocean City Association* v. *Shriver, 64 N. J. Law 550.*

I am convinced that the deed from Mrs. Kelley to Hilton was not only designed to extend to a line above the line of ordinary high tide and to leave in Mrs. Kelley the title to the land lying between that line and the ocean, but also that the line thus established was in fact above the line of ordinary high water.

Another claim of defendant yet remains to be examined.

March 30th, 1903, Mrs. Kelley conveyed to Turner and Young the land lying between the two hundred and seventy-five feet boundary line and the ocean, and by mesne conveyances Turner became the sole owner under that conveyance. The final deed to Turner in severalty was dated April 10th, 1908. In the meantime (January 20th, 1908), Hilton conveyed to Yocum lot 14 on the Kelley map. This conveyance was made by describing that lot by metes and bounds and did not call for the ocean as a boundary. By mesne conveyances one Aiken became owner of lot 14 on the Kelley map September 1st, 1908. All these deeds

in the Aiken title contain the same description as that in the deed from Hilton to Yocum. Defendant, Mrs. Vare, now owns lot 14 under the Aiken title, but the deed from Aiken to defendant, Mrs. Vare, contains a description calling for the ocean as a boundary. November 19th, 1908, Turner, as grantee of Mrs. Kelley of the land outside of lot 14 extending to the ocean, executed a deed to one Reichner for a lot adjacent to and oceanward of lot 14, and of the same size as lot 14. That deed describes the lot by metes and bounds and does not call for the ocean as a boundary, and contains the following covenant:

"Provided, however, and it is hereby expressly agreed and understood that this conveyance is for a definite tract of land and that the said party of the second part, his heirs or assigns, derive no title to lands oceanward of the tract hereby conveyed by reason of the said Atlantic ocean at any time in the future encroaching upon said land hereby conveyed, and upon said ocean receding from lands hereby conveyed the title to said lands oceanward of said lands hereby conveyed remains in said Jesse R. Turner, his heirs and assigns, it is also understood and agreed that in no case shall the said party of the second part, his heirs or assigns, have the right to apply for a riparian grant in front of the lands hereby conveyed, such a right being expressly reserved to the said Jesse R. Turner, his heirs and assigns, it is hereby agreed that the present high-water line is oceanward of the lands hereby conveyed, which lands do not border on the Atlantic ocean, but that land now owned by Jesse R. Turner in front of lands hereby conveyed, do border on Atlantic ocean, and that he, the said Jesse R. Turner, his heirs and assigns, have the exclusive right of applying for said riparian grant under all circumstances."

Notwithstanding the above covenant, Reichner, by quitclaim deed dated August 31st, 1909, conveyed to Aiken territory embracing lot 14 on the Kelley map and all land outside thereof extending to the ocean. The deed from Aiken to defendant, Mrs. Vare, accordingly includes whatever rights Aiken may have acquired by the quitclaim deed which he received from Reichner.

Defendant has accordingly made claim that the deed from Turner to Reichner of November 19th, 1908, although purporting to extend only thirty-nine feet south from lot 14 of the Kelley map, i. e., from the two hundred and seventy-five feet boundary line heretofore described, and although containing the covenant above quoted, in fact extended to the ocean because the

ocean was at that time less than thirty-nine feet southerly of the southerly line of lot 14. In consequence of that claim testimony of witnesses has been heard touching the location of ordinary high tide November 19th, 1908. It should also be noted that Aiken, prior to his conveyance to defendant, also procured quit-claim deeds from both Hilton and Yocum covering the territory between the northerly line of lot 14 and the ocean.

The same, or even greater, difficulties have been encountered in defendant's effort to establish that in the fall of 1908 the line of ordinary high tide was landward of twenty-nine feet south of the southerly boundary of lot 14, as shown on the Kelley map. All witnesses appear to agree that the beach front has gradually made out or oceanward from 1901 or prior thereto to the present time, but do not agree as to the line of high tide in 1908, and I am convinced that upon the whole evidence no finding can be adequately supported to the effect that in 1908 the line of ordinary high water was not oceanward of the exterior boundary described in the deed from Turner to Reichner—that is, a line distant three hundred and fourteen feet southerly from and parallel to Atlantic avenue. But should it be adequately established that at the date of the Turner-Reichner deed ordinary high tides extended shoreward of that line, it is difficult to see how Reichner, or defendant claiming under him, could acquire title to the accretions as against Turner contrary to the covenants of Reichner's deed above quoted.

My conclusions are that the deed of December 30th, 1901, from Mrs. Kelley to Hilton, which deed embraced lot 14 on the Kelley map, did not constitute Hilton a riparian owner, but that, on the contrary, Mrs. Kelley at that time remained the owner of "fast land" outside or oceanward of lot 14 which land so owned by her extended from lot 14 to the ocean; that Turner, as grantee of Mrs. Kelley by mesne conveyances became the riparian owner and that his riparian ownership was not divested by the deed of November 19th, 1908; and that on May 11th, 1914, as such riparian owner, Turner was entitled to receive from the state the riparian lease of that date. It follows that complainant, as grantee of Turner, became the owner of so much of the *locus in quo* as may now be above the ordinary line of high tide, and

lessee, under the Turner riparian lease, of so much of the *locus in quo* as may at this time be outside or oceanward of the ordinary line of high tide.

I will advise a decree pursuant to the prayer of the bill.